**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| EDWARD W. TOVEY, | ) | CASE NO.  1:12-CV-0448 |
| | ) | |
| Plaintiff, | ) | JUDGE BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| NIKE, INC., *et al.*, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | Doc. No. 74 |
| | ) | |

This case is before the undersigned United States magistrate judge on referral for general pretrial supervision.  (Doc. No. 6.)  Before the court is the motion of Defendants Nike, Inc., and Wieden + Kennedy (collectively, "Defendants") to strike the report, and exclude the testimony, of Rhonda Harper, M.B.A, who is Plaintiff Edward Tovey's ("Plaintiff") expert witness.  (Doc. No. 74.)  For the reasons discussed herein, the undersigned recommends that Defendants' motion to strike Ms. Harper's report and exclude her testimony be **GRANTED**; specifically that Ms. Harper's report and testimony with respect to the issues of consumer confusion and damages be stricken and excluded.

## I.  Background

### A.    Complaint and Remaining Claims

This case arises out of Plaintiff's claim that Defendants infringed on his registered trademark, "Boom Yo!," when Defendants used "Boom" in an advertising campaign during  the autumn of 2010.  In December 2012, Plaintiff filed a Complaint alleging numerous claims arising out of the alleged infringement.  (Doc. No. 1.) Defendants filed a motion to dismiss (doc. no. 11) and, thereafter, the undersigned

United States magistrate judge issued a report and recommendation that the motion be denied in part and granted in part (doc. no. 17).  In February 2013, the Court issued an order adopting the report and recommendation, and dismissed all of Plaintiff's claims except: (1) federal trademark infringement (Count Two); (2) federal unfair competition (Count Four); (3) common law unfair competition (Count Seven); (4) common law trademark infringement (Count Eight); (5) a claim under Ohio's Deceptive Practices Act (Count Nine); (6) common law unjust enrichment (Count Twelve); and (7) a claim for declaratory relief (Count Thirteen).

**B.      Plaintiff's Expert Report; Defendants' Motion to Strike and Exclude**

In August 2013, Plaintiff produced his expert report, in which Ms. Harper opines on two issues: (1) the likelihood that consumers will confuse Defendants' use of the word "Boom" with Plaintiff's trademarked phrase "Boom Yo!"; and (2) Plaintiff's damages.  (Expert Report of Rhonda Harper, M.B.A. ("Harper Report"), Doc. No. 74-3.) In her report, Ms. Harper concludes that Plaintiff: (1) "has likely experienced, and will continue to likely experience, consumer confusion of [his] trademark Boom Yo! given the similarity to Defendant's Boom usage"; and (2) "is entitled to $5.9 million in royalties/business damages as a result of Defendant's [*sic*] actions."  (*Id*. at ¶¶ 12, 14.)[1]

In December 2013, Defendants filed a motion to strike Ms. Harper's report and exclude her testimony, arguing that: (1) Plaintiff failed to comply with the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure with respect to Ms. Harper's report; and (2) Ms. Harper's opinions were not sufficiently reliable to be admissible

---

[1] Although there are two defendants in this case, it is apparent that Ms. Harper is referring to Defendant Nike when she uses the word "Defendant" in her report.

2

under Rule 702 of the Federal Rules of Evidence or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Doc. No. 74.)  Plaintiff has filed his opposition to the motion, and so the motion is ready for review.  (Doc. No. 81.)[2] Because Defendants' arguments regarding Rule 26(a)(2)(B) raise a number of issues that are also considered in the context of the admissibility of Ms. Harper's report and testimony, this Court will first consider whether Ms. Harper's report and testimony satisfy the requirements of Rule 702.

## II.  Rule 702

### A.    Standard for Admissibility

Rule 702 permits a trier of fact to rely on the testimony of an expert witness where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule obligates the trial court to act as a gatekeeper and ensure that any expert evidence admitted – scientific or otherwise – is relevant and reliable.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).

Here, Defendants contend that Ms. Harper's conclusions are not reliable.  To determine whether expert evidence is reliable, courts consider: (1) whether the theory

---

[2] At a telephone conference conducted in January 2014, the parties agreed that it was not necessary for the Court to conduct a hearing on Defendants' Motion to Strike. (Doc. No. 79.)

or technique employed by the expert "can be (and has been) tested"; (2) whether the theory or technique has been "subjected to peer review and publication"; (3) the "known or potential rate of error" of the theory or technique; and (4) whether the theory or technique has been accepted by the "relevant scientific community." *Daubert*, 509 U.S. at 593-94.  Although not a "definitive checklist or test," the *Daubert* factors guide a trial court in it's gatekeeping inquiry, which must be "tied to the facts of a particular case." *Id.* at 591 (internal quotation marks omitted); *see Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999) ("[W]here [expert] testimony's factual basis, data, principles, methods or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.") (internal quotation marks omitted; alteration in original). Finally, "it is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

> 1.      **Whether Ms. Harper's Report and Testimony Are Reliable with Respect to the Issue of Consumer Confusion**

In her report, Ms. Harper concludes that consumers "will attribute" Plaintiff's Boom Yo! mark to Defendant Nike.  (Harper Report at ¶ 20.)  Her reasoning in support of this conclusion focuses on two issues: (1) the similarity between Defendants' use of Boom and Plaintiff's use of Boom Yo!; and (2) the size of Defendants' Boom campaign. With respect to the first issue, Ms. Harper makes the following observations in her report:

> 16.      Both marks include and feature the word Boom.
> Plaintiff trademarked Boom Yo!  Defendant used
> Boom.  Plaintiff uses Boom in primary focus on

4

merchandise.  It is used in conjunction with the word YO! which is placed in a secondary position, usually on the back of merchandise.  Defendant uses BOOM in primary focus on merchandise.  It is often used in conjunction with the Nike Swoosh and/or additional message copy, which is secondary.

17.     Plaintiff and Defendant stylistically enhance the word BOOM in an array of nearly identical designed graphic treatments, using similar typestyle fonts and similar layouts.

*   *   *

18.     Both Plaintiff['s] and Defendant['s] marks are derived from the same consumer insight, specifically that BOOM signifies the moment of momentum or change within a sport.

*   *   *

19.     Both marks are placed on similar products or in advertisements: shirts, sweatshirts, hoodies, ball caps, shorts, shoes, jackets and promotional collateral.  Plaintiff produced these articles and advertisements seven years before Defendant, between 2003 and 2010.  Defendant implemented and launched these products and advertisements in the fall of 2010.

(Harper Report at ¶¶ 16-19.)  With respect to the size of Defendants' BOOM campaign,

Ms. Harper made the following relevant observations:

20.     As a result of Defendant's actions, Plaintiff has lost its marketing advantage, as consumers will attribute Plaintiff's BOOM YO! mark to the Defendant.  Although in the market prior to Defendant, Plaintiff's investment was far surpassed by Defendant.  Based on its spending, apparel manufacture and distribution, and media dominance, Defendant garnered national, and international, market awareness of its use of BOOM.

*   *   *

22.     Defendant is the world's largest sports apparel

5

manufacturer, trades on Dow Jones Industrial Average (NKE), has 48,000 employees and 700 retail stores[,] has revenues in excess of $25 Billion – nearly twice its primary competitor, spends more than $6 Billion in selling, general, and administrative, with approximately one-third of that, or $2 Billion, allocated to marketing and advertising.

\* \* \*

23.  Defendant knowingly usurped Plaintiff's trademark and market when it launched the Boom advertising, sponsorship, promotion, and apparel campaign, which dominated the market during Fall 2010.  From that point forward consumers will most likely associate Boom with Defendant and not Plaintiff.

\* \* \*

25.  Defendant claims the launch was not a "campaign," but rather a "seasonal story."  However it is described, it is a well-funded, targeted, multi-media integrated, agency delivered, focused messaging marketing mix program designed to increase brand equity, and by definition, revenue and profits.  September 2010 through December 2010, the $21.5 million Boom seasonal story was comprised of national television advertising, a website, applications for smart phones, sponsorships, spokespersons, in-store merchandising, merchandise, social media, and more focused on the National Football League, the most watched American sport.  In part, Defendant produced enough advertising and collateral that in 0.31 seconds a recent Google search displayed up to 13.5 million results.  With more than 1 million downloads, Defendant also produced the Boom Apps that sync music and provide blasts of encouragement from elite athletes.  With more than 15 million followers, Defendant's Facebook delivered Boom messaging.  At least 100 digital video ads were produced that featured professional elite athletes, musicians, sporting championship events, coaches, prestigious university athletes, multiple professional sports teams, and more.  Defendant created an ESPN Sports Nation Show promotion contest for finding the "best Nike Boom moment." High profile

6

public relations efforts included delivery of Nike Boom Packs of products to elite athletes such as Tim Tebow.  Defendant also created stadium signing and promotions, outdoor advertising (i.e. billboards), and provided support for local Boom events.  The Boom campaign was so powerful, [Defendant Wieden + Kennedy] produced a video about showcasing the campaign and placed it on its website.

26.  In addition to marketing efforts, Defendant launched merchandise.  The SB dunk Hi Boom, originally launched under the name "Premium," was renamed Boom in 2010.  Special promotional apparel, including gloves, hoodies, sweatshirts, and t-shirts sold in Defendant's stores.

(Harper Report at ¶¶ 20-26.)

In sum, Ms. Harper's opinion is that, because Defendants' use of Boom was similar to Plaintiff's use of Boom Yo!, and because Defendants used Boom in an extensive, advertising campaign that used numerous types of media and platforms to reach consumers, "[w]ithout question, among those aware consumers, Boom will be associated with Defendant." (Harper Report at ¶ 29.)  In their Motion to Strike, Defendants argue principally that Ms. Harper's conclusion on this issue is inadmissible because Plaintiff has failed to show that her opinion is the product of reliable principles and methods.[3]  This argument is well taken.

Generally, a party alleging trademark infringement relies upon a consumer survey to prove the likelihood of consumer confusion in a particular case.  *See* 4

_____

[3] In their Reply, Defendants assert that Ms. Harper is not qualified to opine on the likelihood of confusion.  (Reply Brief ("R. Br.") at 5-6.)  They did not, however, raise this particular argument in their Motion to Strike.  New arguments are not appropriate in a reply brief and, thus, Defendants have waived their argument that Ms. Harper is not qualified to opine on the issue of consumer confusion.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:158 (4th ed. 2013); *Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483, 485 (E.D.N.Y. 2008) ("The usual method to introduce evidence on the issue of likelihood of confusion is through consumer surveys.").  Where a party relies on a consumer survey, that party introduces the results "through the testimony of experts who have directed and supervised a survey of potential buyers and who then testify about the survey methodology and data."  *McCarthy, supra*, at § 23:2.75.  In his treatise, cited by both sides in this case, Professor McCarthy opines that, generally, expert testimony on the issue of consumer confusion that is not supported by survey evidence is insufficiently reliable to be admitted:

> At the trial level, the issue of likelihood of confusion is an issue of fact.  Most courts will not allow the expert testimony of a witness who opines on the ultimate question of whether there is or is not a likelihood of confusion. For example, most courts will not allow a jury to hear a witness testify that: "I've been an executive in the Gizmo industry for over twenty years, and in my opinion, defendant's use of the accused trademark Abba will probably confuse customers into thinking they are the goods of plaintiff Alfa."
>
> The reason that such testimony is usually not proper is not that the witness is testifying as to a conclusion of law, but that the witness has no expertise and no factual basis to opine as to the probable state of mind of customers when presented with the conflicting marks. A survey expert has conducted a scientific test and asked questions of potential buyers; other experts have not.

*Id*.  Further, "when an expert does not rely on the primary methodology . . . then that places a burden on the expert to explain his choice of methodologies."  *In re Meridia Prods. Liability Litigation*, 328 F. Supp. 2d 791, 800 (N.D. Ohio 2004) (discussing the issue in the context of causation) (internal quotations marks omitted).

Here, Ms. Harper testified at deposition that she did not conduct a survey to determine the likelihood of consumer confusion in this case.  (Deposition of Rhonda Harper, Doc. No. 74-4 ("Harper Dep.") at 30:2-31:8.)  She agreed that a survey is "the best way to determine whether there is consumer confusion," because "it would be more statistically sound.  It would be projectionable to the national norm.  It is generally what courts rely upon in consumer-confusion cases when brought forth by an expert." (*Id*. at 31:11-23.)  In this case, however, Ms. Harper testified that, rather than conducting a survey, she relied on her "experience and expertise and judgment in working with consumers for 25 years" to support her conclusion that consumers would likely confuse Boom with Plaintiff's Boom Yo! mark.  (*Id*. at 32:3-8.)

The question whether an expert in a trademark infringement case must support his or her opinion regarding consumer confusion with a consumer survey is not settled. At least one court has declined to admit such testimony where the expert relied on a method other than consumer surveys to support his opinion.  *Patsy's Italian Rest.*, 531 F. Supp. 2d at 486 (finding the expert's testimony to be unreliable because he "appear[ed] not to have relied on such a consumer survey, but, rather . . . drew his conclusions based upon his own personal knowledge and expertise").  Another court has concluded that an expert opinion on the issue may be admissible absent a survey. *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, No. 1:08-cv-2376-TWT, 2010 WL 3075318, *5 (N.D. Ga. Aug. 4., 2010) (observing that a consumer survey "would make [the expert's testimony] stronger and more persuasive," but determining that the lack of a consumer survey went to weight, rather than to admissibility).  No court in this Circuit, however, has determined that a consumer survey is required to support

9

an expert's opinion regarding consumer confusion in a particular case.  Accordingly, Ms. Harper's decision to forego a consumer survey in this case is not necessarily fatal to the admissibility of her opinion, so long as Ms. Harper satisfied her burden of explaining why she chose those other methods, and those other methods are sufficiently reliable to support her conclusion.

Plaintiff contends that Ms. Harper's report "carefully catalogues" her reasoning on the issue of consumer confusion.  (Pl. Opp. at 12.)  This Court disagrees.  Ms. Harper's report does not identify any methodology that she used in forming her opinion regarding consumer confusion in this matter.  Nor does it explain why she failed to conduct a consumer survey.  Rather, the section of her report addressing this issue consists of: (1) a description of the similarities between Plaintiff's Boom Yo! mark and Defendants' use of Boom; (2) a description of Nike's Boom campaign and marketing; and (3) Ms. Harper's conclusion that there is consumer confusion.  The report does not describe the methods she used to assess the likelihood of confusion, or the principles she applied in forming her opinion.  The "careful catalogue" of reasons to which Plaintiff refers is merely a list of factual assertions accompanied by a conclusion without any explanation for its basis or reliance on accepted methodology.

Review of the deposition transcript reveals that, rather than explaining the methodology she used in forming her opinion on this issue, Ms. Harper's testimony actually emphasized the extent to which she failed to articulate either her reasons for selecting the methods she employed or the bases for her conclusion regarding consumer confusion.  During her testimony, Ms. Harper described her methodology as "unconventional," testified that she was "not aware of case law or court-approved . . .

10

methodology for consumer confusion without a survey," and conceded that "the survey is the most accepted practice." (Harper Dep. at 50:18-23.) In response to questions regarding why she did not conduct a survey, Ms. Harper explained that she could not have done so within the amount of hours for which Plaintiff had agreed to compensate her:

> Q:    So why did you not conduct a consumer survey in this case?
>
> A:    It was a cost containment issue.
>
> Q:    Were you given a budget for this case?
>
> A:    I . . . was asked to keep my fees within a certain parameter.
>
> Q:    What parameter?
>
> A:    I don't know that it was ever discussed in those kinds of terms, but it was in terms of hours, you know, 'Can you do this in 20 hours or what have you?' Certainly, the cost of a . . . survey was outside the scope.
>
> Q:    So were you asked to keep your time within 20 hours?
>
> A:    I don't recall whether or not that was specifically said. I went through an agency, and they initially scoped the work in terms of the number of hours they believed are necessary, and it was very contained.
>
> Q:    And you don't recall what the containment was?
>
> A:    No, but I'm very close to it, I'll tell you that.

(Harper Dep. at 30:12-31:8.) Ms. Harper's explanation for failing to conduct a survey in this case is not sufficient, particularly in light of her concession at deposition that a consumer survey is the generally accepted method of demonstrating consumer confusion in a trademark infringement case and her failure to articulate any other

generally accepted methodology.  The fact that Plaintiff deliberately elected to alot his

expert witness insufficient resources  to support her conclusions and made a purposeful

decision to put minimal effort into the expert report is not, for the purposes of Rule 702,

a sufficient explanation for the expert's decision to forego a survey in this case.

Further, Ms. Harper failed to explain how her methods were sufficiently reliable to

support her conclusion.  Although Ms. Harper testified that she had applied "different

methodologies" in determining whether there was consumer confusion in this case, she

was not able to completely explain how she had applied those methodologies to arrive

at her conclusion:

> Q:     So what factors did you take into account in forming
>        your opinion in this case regarding likelihood of
>        confusion?
>
> A:     I would say the experience set was critical, so what
>        was the . . . consumer exposed to or would the
>        consumer be exposed to, in what context in terms of
>        an advertising campaign, an online website or
>        initiative, apparel, et cetera.  So . . . what's the level of
>        involvement in each of these?  What's the level of
>        brand awareness?
>
>        With regard to Nike, I looked at the similarity just in
>        terms of the visualization of the mark itself and how it
>        was being presented graphically to the consumer.  I
>        took into account the history of the brand and how it
>        normally produces itself.
>
>                             *   *   *
>
>        *I may not have articulated every single step in the
>        report, but I did consider a lot of different factors.*
>
> Q:     [N]ow you're saying that you may not have articulated
>        each step of your analysis in the report.  So I need to
>        know today what other steps you engaged in to form
>        your opinion that are . . . not reflected in the report.

A:     I don't know that it's that simple to explain.  I think that all — it's all in here.  It just may not  – it may be more general than what I'm explaining to you now.  I did not go into the framework and the methodology and all that for every single step in here.

\*  \*  \*

*What I did do is I generalized it and then I gave my opinion on it.*

Q:     Okay.  For which steps in the analysis did you not identify specifically what you did?

A:     *Perhaps all of them.*

\*  \*  \*

Q:     You're telling me that your report generalizes the steps in your analysis and you may not have articulated specifically each step, correct?

A:     Correct.

Q:     But you're not prepared to tell . . . me what those specific steps are today?

A:     I'm not.

Q:     And how would you go about identifying what those steps are?

A:     I would put down on paper the frameworks that I rely on that exist in my mind and my experience to put all of this into context within that.  Again, given the scope of the project that I was given and the amount of time to develop the report, that would have doubled or tripled the amount of time required to explain all of those various things.

(Harper Dep. 54:20 to 58:8 (emphasis added).)

Because Ms. Harper did not fully articulate the steps in her analysis – either in her report or during her deposition – there is no evidence from which this Court can

13

determine whether her conclusion on the issue of consumer confusion is "the product of reliable principles and methods" or whether she "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  These are threshold requirements for the admission of expert testimony.

Plaintiff argues that Ms. Harper's experience is sufficient to support her opinion regarding consumer confusion in this case.[4]  It is well established that an expert 's experience may be the basis for reliable testimony.  The Advisory Committee Notes to Rule 702 specifically contemplate such a situation:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

Fed. R. Evid. 702 advisory committee's note (2000).   It is not, however, sufficient for an expert merely to cite to her experience without further explanation.  Rather, an expert must be able to articulate the connection between her experience and her conclusions in a particular case:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably

---

[4] Additionally, Plaintiff cites to several cases holding that a consumer survey is not required to prove consumer confusion. (Pl. Opp. at 14.)  While an accurate statement of law, see, e.g., Mexican Food Specialties, Inc. v. Festida Foods, Ltd., 953 F. Supp. 846, 852, n.9 (E.D. Mich. 1997), these cases do not require the admission of Ms. Harper's opinion because the decisions to which Plaintiff cites address the issue of whether a party offered sufficient proof on the issue of consumer confusion, not whether an expert's opinion on the issue was admissible under Rule 702.

14

>    applied to the facts.  The trial court's gatekeeping function
>    requires more than simply "taking the expert's word for it."

*Id*.

In this case, Ms. Harper's report describes her credentials and experience, which include a Masters of Business Administration from Emory University and "more than 25 years of professional marketing, research, strategy, brand, and innovation experience with Fortune 500 corporations," as well as "strategic planning, market/consumer research and insights, and consumer promotion experience."  (Harper Report at ¶¶ 1, 4, 6.) Plaintiff contends that "the linkage" between Ms. Harper's experience and her opinion regarding consumer confusion "seem[s] quite clear."[5]  (Pl. Opp. 13.)  Plaintiff, however, cites to nothing in the record or the expert report that explains how Ms. Harper's experience reliably supports her conclusion on consumer confusion.  Her report does not describe how her experience led to her conclusion regarding consumer confusion.  Nor does it explain why her experience is a sufficient basis for her opinion, or how she reliably applied her experience to the facts of the case.  Ms. Harper's report does not articulate a reliable connection between her experience and her conclusion regarding consumer confusion in any way, much less to the extent described in the Advisory Committee Notes to Rule 702.

Further, Ms. Harper's deposition testimony did not cure the deficiencies in her

---

[5] Plaintiff notes that, in denying Defendants' motion to dismiss Plaintiff's Complaint, the undersigned observed that it was "plausible that an unwary consumer might mistake Nike's goods" for Plaintiff's goods because both Defendants and Plaintiff used the word "Boom" in various fonts and colors, without any uniform arrangement.  (Pl. Opp. at 12, n.9.) The undersigned's observation of the plausibility of confusion in this case is not a finding that consumer confusion exists.  Nor is it sufficient to support Ms. Harper's expert opinion on this issue.

15

report.  During her deposition, Ms. Harper stated that her "experience and working with consumers and research for so many years" provided her "with a bit of insight."  (Harper Dep. at 50:24-51:1; 51:15-16.)  She did not, however, articulate how she applied that "insight" and "experience" to the facts of this case in a reliable manner.  *See Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 671 (6th Cir. 2010)* ("The *ipse dixit* of the expert alone is not sufficient to permit the admission of an opinion.") (internal quotation marks omitted).  Plaintiff points to no instance in the record where Ms. Harper explains how her experience reliably supported her conclusion regarding consumer confusion.   *See Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995)* (on remand) ("We've been presented only with the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough.").  In sum, the record is devoid of any explanation why Ms. Harper's experience reliably supports her conclusion in a way that is sufficient to satisfy the threshold requirements of Rule 702.

For the foregoing reasons, Plaintiff has failed to demonstrate either that Ms. Harper employed a reliable method in forming her opinion regarding consumer confusion in this case, or that her experience reliably supported her conclusion on this issue.  *See Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir. 2000)* ("By defining evidentiary reliability in terms of scientific validity, the *Daubert* court instructed district courts that their primary function as 'gatekeepers' is 'to determine whether the principles and methodology underlying the testimony itself are valid.'") (quoting *United States v. Bonds, 12 F.3d 540, 556 (6th Cir. 1993)*).  Absent reliable support for her conclusion, Ms. Harper's opinion amounts to "only speculation, which is generally inadmissible. '[N]o matter how good' experts' 'credentials' may be, they are 'not permitted to speculate.'" *Tamraz, 620 F.3d at*

16

671 (quoting *Goebel . Denver & Rio Grande R.R. Co.*, 215 F.3d 1038, 1088 (10th Cir. 2000)).  Accordingly, Plaintiff has failed to carry his burden of demonstrating the admissibility of Ms. Harper's opinion and testimony regarding the issue of consumer confusion in this case.  It is recommended that Defendants' motion with respect to Ms. Harper's report and testimony regarding the issue of consumer confusion in this case be GRANTED.

> **2.   Whether Ms. Harper's Report and Testimony Are Reliable with Respect to the Issue of Damages**

In her report, Ms. Harper concludes that "Plaintiff is entitled to $5.9 million for the Defendant's use of Boom."  (Harper Report at ¶ 48.)  To support her conclusion, Ms. Harper stated the following:

> 27.   Defendant claims a Boom campaign investment of $21.5 million.
>
> *   *   *
>
> 28.   It is reasonable to assume other budgets contributed an additional 50% of the advertising budget, bringing the total to nearly $32.3 million – or $8 million per month.  This is a common practice among large, global corporations that have many marketing levers.
>
> *   *   *
>
> 43.   Defendant likely increased revenue by $64.6 million through its $32.3 million investment in the Boom campaign, with estimated return on marketing investment (ROMI) at 2:1 per its marketing spend.  Companies use the Return on Marketing Investment (ROMI) to determine the amount of sales achieved for every dollar spent on marketing.  ROMI is simply Net Profit divided by Campaign Cost.  According to Nielsen Analytic Consulting across many industries worldwide, average the ROMI is 1.09, or for every dollar spent in marketing, the company receives $1.09 in short-term sales return within three months,

more for longer term sales based on TV advertising:

[Graph Depicting Short Term ROMI From Various Sources]

Given Defendant's investment in marketing along with its infrastructure, sophistication in delivering multimedia, integrated campaigns, use of professional agencies, heavy weight in media, and success in the market, it can be safely estimated to deliver a much higher than the global average ROMI. In my experience, large U.S. consumer oriented corporations demand a 2.0-5.0 ROMI to continue to fund marketing initiatives, as these monies are hard-fought for other corporate initiatives (e.g. research and development, sales, capital expenditures, and so on) or even dropped to the bottom line to increase profit margins.  For the purposes of this report, however, I conservatively estimate Defendant's ROMI at 2.0.

44.     While the Defendant's Boom campaign's results are only a fraction of the many factors driving its stock price, during the campaign the Defendant enjoyed strong performance with its stock increasing more than 20%:

[image of an internet page showing the change in value in Nike stock between August 19, 2010 and December 27, 2010]

45.     As Defendant stated that the Boom campaign was successful, it enhanced and/or lessened future depreciation of Nike's brand equity.  I will take two of the commonly accepted brand value approaches to estimate the brand value enhancement due to the Boom campaign: Cost Basis and Net Present Value. Cost Basis approach yields $32.3 million brand value: Defendant invested $32.3 million in the brand during the Boom campaign.  Net Present Value of Incremental Cash Flows associated with a brand approach yields $113.9 million, assuming a 30% margin, 3-year return, $48.5 million initial year sales, 85% brand loyalty, a 365 day product life cycle, and a 5% interest rate.

* * *

48.    The Plaintiff is entitled to $5.9 million for the Defendant's use of Boom.  While a big number, at an average price of $100 per product sold, this is equal to Defendant paying Plaintiff for the Boom trademark helping to sell only 59,000 products of the 646,000 products it sold largely by usurping its mark.  With an estimated ROMI of 2.0, a contribution margin of 60%, and an industry-standard royalty rate of 8%, the Plaintiff is owed $3.1 million.  Applying these same metrics to increased brand value based on the Boom campaign halo-effect among consumers over the next three years, 65% consumer loyalty rate, 50% brand dilution per year, 5% NPV, and a 1-year purchase cycle, the Plaintiff is owed an additional $2.8 million.

(Harper Report at ¶¶ 27, 28, 43-48.)

Defendants argue that Ms. Harper's report and testimony regarding damages in this case are unreliable and unduly prejudicial principally because her conclusion relies on figures that are not based on the record and, thus, are speculative.[6]  This argument is also well taken, as Ms. Harper's deposition reflects that many of the relevant figures that she used in her calculation of damages in this case are based on impermissible speculation.[7]

---

[6] Defendants argue that Ms. Harper's report is inherently unreliable because she failed to consider the threshold issues of whether Plaintiff used "Boom Yo!" as a trademark or whether Nike used "Boom" as a trademark.  (Motion to Strike at 13-14.)  These issues, however, are relevant to elements of Plaintiff's claims other than consumer confusion and damages, and, thus, are more appropriate for summary judgment in this case.

[7] Defendants also argue that Ms. Harper is not qualified to opine on the issue of damages in this case.  The record, however, is not sufficiently developed for the Court to decide this issue.  Further, because her opinion on this issue in this particular case is unreliable, this Court need not determine whether Ms. Harper is qualified to opine on this issue in general.  *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528 (6th Cir. 2012) (declining to decide the issue of whether a proposed witness was qualified to give expert testimony because the district court had not abused its discretion in determining that the proposed expert's methodology was not sufficiently reliable to allow

It is well established that, while an expert witness may extrapolate from known facts to form a conclusion, an expert witness may not support her opinion with mere speculation:

> An expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds based on what is known.  The expert's conclusions . . . must have a basis in established fact and cannot be premised on mere suppositions.  An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.  However, mere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than its admissibility.

*McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (internal quotation marks, alterations and citations omitted).  "Like all expert testimony, an expert witness's calculations of [damages] are inadmissible under [Rule 702] if based on 'unsupported speculation.'" *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 727 (6th Cir. 2012).

During her deposition, Ms. Harper conceded that she had relied on an "unconventional" method to calculate Plaintiff's damages in this case:

> Q:     So what methodology did you employ in this case to determine damages?
>
> A:     A very unconventional one, given that the– I was not provided with any sales or profit data.  I was not provided any real quantifiable metrics from counsel from Nike.  If it exists, I haven't seen it.
>
> And in the absence of – in the absence of that and in the absence of any kind of internal marketing research data that Nike may have on its awareness and usage of its brand or mark campaign

his testimony).

> performance, I had to make some unconventional
> decisions to build a case of logic that pointed in the
> direction of what that – those damages may be.
>
> And in doing that, I relied on common industry
> information and data that I've footnoted, as well as
> my own experience.  This is not the ideal way to do it.
> It's not the way that I have done it in the past, but
> given the resources and given what I was provided, I
> was to opine on what I believe, given all of that, the
> damages may have been.

(Harper Dep. at 129:14-130:8.)

Further, in response to questions about the figures she used in calculating damages in this case, Ms. Harper conceded that many of her numbers were not based on data or other information in the record.  For example, with respect to the ROMI – which was the basis for her conclusion that Nike increased its revenue by $64.6 million through the Boom campaign – she testified that, "In my experience, brand marketers are somewhere in the 2 to 5 world.  Proctor & Gamble requires a 5-fold return on investment.  Coca Cola is at 4.  When I was at Warner Lambert, we were at 3, so it varies.  I thought I took a very conservative one at 2 for Nike.  *It certainly could be more than that.  It could be less than that.  I don't know*."  (*Id*. at 132:19-133:1 (emphasis added).)  Similarly, Ms. Harper was unable to identify a factual basis for her assumptions that: (1) the relevant products had a one-year product cycle (*Id*. at 151:21-152:8 ("Again, could be more, could be less, but again, I was trying to get a general methodology down and using best estimates or plugs for some of these numbers that I just simply had no data to access.")); (2) Nike has an 85% brand loyalty rate (*Id*. at 153:10-24); or (3) Nike had a 40% profit margin (*Id*. at 162:5-10).  She testified that her assumption regarding the average price of a Nike product had no basis in any data or information from the record:

Q:     How did you come up with $5.9 million?

A:     I had to use a surrogate here.  It's . . . because this is an odd case, in that's reversed, there's really — given that I had no data from Nike to go on, I was trying to find a surrogate way to estimate the value to Nike of using Boom Yo! or Boom in its campaign, and when I say that, I mean also the context and the creative execution.

I had to make some assumptions.  I assumed an average price of $100 per Nike product.  *I pulled that out of the air.  It's a nice round number.  Their average price point could be $200.  It could be $50.  I don't know.  I don't have access to that data.*.

Q:     And you didn't go on the Nike website and do a sampling of products to try to come up with –

A:     No matter what kind of small sampling that I would have provided, it would not have been statistically relevant, nor do I have their actual margins, so it was better just to pull an actual number here and state it so that we could ground this.

Q:     So is it fair to say that $100 per product was really more of a placeholder?

A:     *Yes, yes, as were quite a few of these numbers, because again, I wasn't provided with anything from Nike*, so it was, again, looking at a logical methodology rather than believing that the average price is a hundred dollars.

(*Id*. at 159:20-160:21 (emphasis added).)

Ultimately, Ms. Harper conceded that, because many of her calculations were based on "estimates" and "assumptions," she could not state with any reliability whether her conclusion that Plaintiff was entitled to $5.9 million in damages was accurate:

Q:     Now you're telling me that's not really your opinion, correct?

A:     What I'm telling you is that if we use the assumptions

22

> I called assumptions within the scope of the report, the plaintiff would be entitled to, under this scenario, using these estimates, $5.9 million.
>
> Q:  But you don't really know what he's entitled to, if anything, right?  Let's assume that he's entitled to something.  You don't know –
>
> A:  If we had the data from Nike, the actual data, that could be calculated, theoretically.
>
> Q:  But we have no idea, sitting here today, whether that's $5.9 million or not?
>
> A:  Correct.  As I said within the report, assuming the following numbers, which I can't – I have to assume that they're going to be incorrect, but incorrect in which direction, I don't know.

(*Id*. at 165:9-25.)

Ms. Harper's deposition testimony reveals that many of the figures upon which she relied in making her damages calculation in this case have no factual basis other than her own guesswork because she did not have access to the data she required to ascertain the actual figures themselves.  (*Id*. at 170:22-171:3 ("And by putting in here these assumptions, I believed I was giving both sides . . . the ability to go in and challenge those numbers, which I'm fine with because I know that they were estimates.  The fact of the matter is, we could not or I could not get my hands on any real Nike data.").)  She testified that Plaintiff did not provide her with information that she generally would have used to make her calculations, and that she refrained from obtaining information that may have provided support for her assumptions:

> A:  It's also unusual in my experience that a client . . . doesn't provide the data around sales and, you know, profits and campaign, all the stuff to be able to take a look at.  In fact, they went further to say they don't even care about revenues and profits and things like

23

that, which is unusual.

Q:   Did you attempt to determine, from any public source, any of the data that you believe you would need to conduct your analysis?

A:   I didn't go to their 10(k)s. I didn't use their annual reports. I rested on my experiences.

*   *   *

Q:   Why didn't you go to the 10(k)s?

A:   I could have. They're not going to give me as detailed of information as I need. They don't track campaigns. They don't track campaigns to sales rates. They have margins, but they're – generally, very global margins are produced in the backs of these reports. It's hard to track back to a specific geography smaller than the United States, for instance, or something like that.

   *So yeah, I could have, but again, there's lots of things that I could have done with more time and resources.*

(178:17-179:17 (emphasis added).)

Plaintiff does not dispute that Ms. Harper's conclusion regarding damages in this case relies on multiple assumptions. Rather, he argues that these assumptions were appropriate and permissible because "Courts in this district necessarily engage in speculation themselves in awarding profits in trademark infringement actions." (Pl. Opp. at 19.) Plaintiff cites *Sun Prods. Group, Inc. v. B&E Sales Co., Inc.*, 700 F. Supp. 366, 386-87 (E.D. Mich. 1988), to support his argument. The decision *Sun Prods. Group*, however, does not address the requirements of Rule 702 with respect an expert opinion in a trademark infringement case, much less relax those requirements based on the nature of damages in such a case. Rather, in that case, the trial court considered the opinion of the plaintiff's expert in light of evidence proffered by the parties and made a

24

reasoned conclusion regarding the amount of damages in the case.  Absent some legal authority allowing an expert witness to engage in unsupported speculation in the context of damages in a trademark infringement case, Plaintiff's argument lacks merit.  The record reflects that Ms. Harper's conclusions with respect to damages in this matter relied on assumptions that – by her own admission – had no basis in the record or other facts. Accordingly, her opinion regarding damages in this case relies on the "subjective belief and unsupported speculation" that is specifically prohibited by Rule 702.  *McLean*, 224 F.3d at 801.

Finally, Defendants argue that Ms. Harper's report and testimony are unreliable because she calculates the damages attributable to Defendants' use of Boom without accounting for the fact that Boom was one element in a multifaceted campaign.  (Motion to Strike at 16-17.)  According to Defendants, in order for Ms. Harper's opinion on this issue to be reliable, she should have ascertained the ROMI only for the use of Boom and based her calculations on that figure.  (*Id*.)  Defendants, however, contend that the very calculation they suggest is impossible.  (*Id*.)

In his report, Defendants' expert, Itamar Simonson, Ph.D., a professor of marketing at Stanford University, opines that Ms. Harper's conclusion that the Boom campaign added a specific value to Defendant Nike's brand value relies on a calculation that is impossible to make:

> 40.  One of Ms. Harper's key assumptions is that the benefits derived from the campaign at issue must have been large and easy to measure . . . .  This key assumption is false.  If Ms. Harper has figured out a way to determine whether an advertising campaign is profitable or effective, she should certainly publish it in a scientific journal.  Indeed, as I teach my students, advertising agencies and companies have no way of

25

knowing or measuring whether an advertising campaign generated profits or enhanced brand equity (with the exception of some direct-response advertisements such as infomercials).

\* \* \*

41.    [T]he assumption that Nike must have earned a profit on the campaign at issue and this return can be measure is detached from reality.  Furthermore, attributing any profit to a particular word in an advertisement is impossible.  That is, to the extent that Ms. Harper suggests that the use of "boom" made Nike's advertisements more profitable, the relevant comparison is between the advertisements that were used and alternative advertisements Nike might have used (spending the same amount) without the word "boom."  Considering that Ms. Harper has no basis for making such a comparison, her opinions have no scientific basis and are mere speculations.

(Report of Itamar Simonson, Ph.D. ("Simonson Report"), Doc. No. 74-5 at ¶¶ 40-41.)

As discussed above, Ms. Harper conceded at deposition that her method for calculating damages in this matter was "unconventional," and that she made "unconventional decisions" in calculating damages because she did not have any sales or profit data upon which to rely.  (Harper Dep. at 129:14-16, 129:20-130:1.)  As with her opinion regarding consumer confusion, Ms. Harper's explanation for her decision to use a method other than the conventional method to calculate damages in this case is not sufficient to render her opinion on damages admissible under Rule 702.  The fact that Plaintiff did not obtain or provide Ms. Harper with the information necessary for her to support her conclusions is not an appropriate basis for this Court to accept Ms. Harper's admittedly "unconventional" method of calculating damages in this case.

Ms. Harper's opinion regarding damages in this case is based on impermissible speculation.  Further, her explanation for relying upon a method of determining damages

that, by her own admission, is "unconventional," was not sufficient to support her conclusion under Rule 702.  Accordingly, it is recommended that Defendant's Motion to Strike with respect to Ms. Harper's report and testimony regarding the issue of damages in this case be GRANTED.

### III.  Rule 26(a)(2)(B)

**A.      Rule 26(a)(2)(B)**

Rule 26(a)(2)(B) governs the contents of an expert report.  Specifically, the Rule requires that an expert report contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Where "a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(a) "generally serves to allow both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case."  *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007).   Further, federal courts generally require that a party comply with the requirements of Rule 26(a)(2) "to the fullest practical extent."  *Thibeault v. Square D. Co.*, 22 F.2d 239, 244 (1st Cir.

1992) (citing *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958)).

Here, Defendants contend that Plaintiff failed to comply with Rule 26(a)(2)(B) because Ms. Harper's report did not contain: (1) a complete statement of the bases and reasons for her opinions; (2) actual facts or data; (3) a list of prior cases; or (4) a statement of compensation.  According to Defendants, these omissions were not harmless "but go to the central issues of likelihood of confusion or damages."  (Motion to Strike at 8.)  Defendants' argument regarding the "facts and data" in Ms. Harper's report lacks merit.  Their remaining arguments, however, are well taken and provide an alternative basis for striking Ms. Harper's expert report.

## A.      Rule 26(a)(2)(B)(ii) - Facts or Data

Defendants argue that Ms. Harper's report does not comply with Rule 26(a)(2)(B)(ii)'s requirement that the report contain "the facts or data considered by the witness in forming" her opinion.  Defendants rely on Ms. Harris's admission at deposition that she speculated regarding many of the figures upon which she based her damages analysis.  (Harper Dep. at 159:20-160:21, 170:22-171:3,178:17-179:17.)  The fact that she speculated regarding these figures, however, does not render her report insufficient to satisfy subsection (a)(2)(B)(ii).   The Rule requires only that an expert report contain "the facts or data considered by the witness."  In the portion of Ms. Harper's report addressing her opinion regarding damages, she described the facts and data on which she relied in calculating Plaintiff's damages.  Defendants do not dispute that Ms. Harper's report sets forth the figures on which she relied.  Rather, they argue that her report is insufficient because she arrived at those figures via speculation.  This argument, however, addresses the reliability of that information, an issue that is the focus of the

28

*Daubert* analysis – not Rule 26(a).  *See, e.g., Burke v. U-Haul, Intern.*, No. 3:03-CV-32H, 2004 WL 5499520, *12 (W.D. Ky. Dec. 7, 2004) ("Rule 26(a)(2)(B) is not a means by which to impose a *Daubert* standard upon the contents of an expert witness report."). Accordingly, this argument lacks merit.

**B.      Rule 26(a)(2)(B)(i) - Basis and Reasons for Ms. Harper's Opinions**

Defendants contend that Ms. Harper's expert report does not conform to the requirement of Rule 26(a)(2)(B)(i) that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Specifically, Defendants contend that, because Ms. Harper conceded at deposition that her report did not contain a complete description of the steps she took in her analysis of the issue of consumer confusion (Harper Dep. at 54:20-55-:21 ("I may not have articulated every single step in the report, but I did consider a lot of different factors."), her report violates subsection (a)(2)(B)(i).  Plaintiff responds that Defendants interpret subsection (a)(2)(B)(i) too literally, and argue that the Rule does not require Ms. Harper to "break down each 'step-within-each-step,' to the point of explaining why 2 + 2 = 4."  (Pl. Opp. at 6.) According to Plaintiff, Ms. Harper's report is sufficient to satisfy the requirement of subsection (a)(2)(B)(i), which is not as rigorous as the standard for admissibility under *Daubert*.

Plaintiff is correct in asserting that Rule 26(a)(2) creates a lighter burden than *Daubert* for the admission of an expert report.  *See Burke*, 2004 WL 5499520 at *12. Accordingly, Rule 26(a)(2) does not "require that a report recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*."  *McCoy v. Whirlpool Corp.*, 214 F.R.D.

29

646, 652 (D. Kan. 2003).  Here, however, the portion of Ms. Harper's report addressing consumer confusion does not comply at all with the requirement of subsection (a)(2)(B)(i).  Her report is devoid of any description of the steps she took to form her conclusion regarding consumer confusion in this case.  Rather, it only consists  of: (1) a description of the similarities between Plaintiff's Boom Yo! mark and Defendants' use of Boom; (2) a description of Nike's Boom campaign and marketing; and (3) Ms. Harper's conclusion that there is consumer confusion.  Accordingly, the report does not provide a basis or reasons for her conclusion that consumer confusion exists in this case.  *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp 2d 905, 910 (N.D. Ohio 2008) (Lioi, J.) ("The report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them.") (quoting *Hilt v. S.F.C., Inc.*, 170 F.R.D. 182, 185 (D. Kan. 1997)).  Moreover, this deficiency was not cured in her deposition.  Absent some description of the basis for this conclusion, Ms. Harper's report does not satisfy the requirements of Rule 26(a)(2)(B)(i).

**C.     Rule 26(a)(2)(B)(v)-(vi) - Other Cases and Compensation**

Finally, Defendants note that Ms. Harper's report did not contain either the list of prior cases in which she had testified as an expert required by Rule 26(a)(2)(B)(v) or the statement of compensation required by subsection (a)(2)(B)(vi).  Plaintiff does not dispute that the report omitted these items.  Plaintiff contends, however, that Defendants were not prejudiced because, at deposition, Ms. Harper testified regarding her rate of compensation and listed the names and circumstances of the previous cases "that she could recall."  (Pl. Opp. 2-3.)   According to Plaintiff, the appropriate remedy in this case

30

is to issue an order directing Plaintiff to provide Defendants with a statement of compensation for Ms. Harper and a list of previous cases in which she testified as an expert.  (Pl. Opp. at 4-5.)  Plaintiff also notes, however, that after Ms. Harper's deposition, he supplemented her expert report with those items.[8]

Plaintiff's arguments miss the point of the Rule 26(a)(2)(B) disclosures, which is to "minimize the expense of deposing experts, and to shorten direct examination and to prevent an ambush at trial."  *McCoy*, 214 F.R.D. at 652.  Providing the information required by Rule 26(a)(2)(B) after the opposing party has deposed an expert witness deprives the opposing party of the opportunity to fully explore relevant areas of inquiry during that deposition.  Further, Plaintiff has offered no explanation for the omission of the information clearly required by Rule 26(a)(2)(B), and, thus, raises no basis upon which this Court could conclude that the omissions were sufficiently justified to avoid sanctions under Rule 37(c)(1).  Accordingly, Plaintiff's failure to comply with the disclosure requirements of Rule 26(a)(2)(B) provides a sufficient basis – in addition to its unreliability under Rule 702 – to strike Ms. Harper's expert report in this matter.

---

[8] Even if Plaintiff had not yet supplemented Ms. Harper's report with the required information, requiring him to do so would only serve to further delay this case.  The parties had more than one year to conduct discovery in this matter, during which Plaintiff had sufficient time to provide this information to Defendants.

## IV.  Conclusion

For the reasons given above, it is recommended that Defendants' Motion to Strike

be **GRANTED.**


Date: April 2, 2014                          s/ *Nancy A. Vecchiarelli*
                                             NANCY A. VECCHIARELLI
                                             U.S. MAGISTRATE JUDGE


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**